## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE
## AT GREENEVILLE

GEORGE HUBERT SIMPSON,       )
         Petitioner,         )
                              )
v.                          )      **NO. 2:02-CR-71**
                              )      **NO. 2:03-CR-98**
                              )      **NO. 2:09-CV-263**
                              )      **Judge Greer**
                              )
**UNITED STATES OF AMERICA**,    )
         Respondent.        )

## <u>MEMORANDUM OPINION</u>

### I.    Introduction

Petitioner, George Hubert Simpson ("petitioner" or "Simpson") has moved to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255 as to Count 2 (conspiracy to distribute and possess with the intent to distribute methamphetamine), Count 7 (brandishing a firearm in furtherance of a drug trafficking offense), Count 9 (aiding and abetting kidnapping), and Count 10 (aiding and abetting possession of a firearm in furtherance of a crime of violence, *i.e.*, kidnapping)[1] in case No. 2:02-CR-71. Simpson likewise moves pursuant to § 2255 to vacate his conviction and sentence in case No. 2:03-CR-98 which charged him with escape in violation of 18 U.S.C. § 751(a), [Doc. 374].[2] The Court has previously granted the motion in part and has vacated Simpson's

---

[1] Simpson was found not guilty of Counts One (conspiracy to distribute and possess with intent to distribute 5 grams or more of methamphetamine), Count Five (possession of a firearm in furtherance of a drug trafficking offense) and Count Eight (conspiracy to commit kidnapping).

[2] Simpson was tried by a jury in case No. 2:02-CR-71 and pled guilty pursuant to a negotiated plea agreement in case No. 2:03-CR-98.

conviction and sentence as to Count 10 in case No. 2:02-CR-71, [Doc. 430]. For the reasons which

follow, the motion to vacate, set aside or correct will be DENIED as to all other claims.

## II.    Procedural Background

The full procedural background is set out in the Court's prior memorandum opinion. [See

Doc. 430].

## III.    Factual Background

The following facts are taken from the Sixth Circuit's unpublished opinion in the direct

appeal taken by Simpson and his co-defendants, Vance Bowers and Allan Mark Ajan from their

convictions and sentences in No. 2:02-CR-71:[3]

> On November 26, 2000, Officer Eric Alford of the Kingsport
> Police Department (located in Tennessee) arrested Allen Ajan for
> drunken driving. When an inventory search of Ajan's car revealed
> items commonly used in drug sales–a bag of white powder (later
> determined to contain methamphetamine), reclosable plastic bags, a
> digital scale and a cell phone–Officer Alford used the redial function
> on Ajan's cell phone to determine whom Ajan had last contacted.
> George Simpson answered the call, and Alford (without identifying
> himself) told Simpson that Ajan had passed out and that he feared the
> police would arrest both Ajan and him. When Alford asked Simpson
> what he should do, Simpson replied, "Bring him to me, he's my
> boss," and directed Alford to bring Ajan to a local Coastal Mart so
> that Simpson could pick him up. JA 485. Alford reported the contact
> to Officer Mike Hickman, who proceeded to the Coastal Mart to meet
> Simpson.
>      Arriving at the Coastal Mart at 10:00 p.m., Officer Hickman
> observed two men dressed in camouflage entering the store. Noting
> that they also wore bullet-resistant vests and that they carried  two-
> way radios and a pair of binoculars, Hickman asked the men to
> identify themselves.   According to Hickman, one of the men
> identified himself as Simpson; the other identified himself as Vance
> Bowers.  Both men consented to pat-down searches, which revealed
> that Simpson was carrying a  loaded .38 revolver.   The police later

---

[3]    *United States v. Simpson*, 116 Fed. App'x 736 (6th Cir. 2004).

searched Simpson's house, finding several other weapons but no drugs.

Two weeks later, on December 8, 2000, Ajan, Simpson, and Bowers found White at the West Side Inn in Kingsport, where White had rented a room for the night. When White answered their knock on the door, Ajan followed Bowers into the room and struck White on the head with the walkie-talkie he was carrying. Displaying a pistol, Ajan demanded $150 of White, presumably for the "eight ball" (slang for an eighth of an ounce) of methamphetamine that Ajan had given White several days earlier. Two of White's friends, Curtis McDavid and Ricky Howe, then arrived at the hotel room. Seeing Ajan, Simpson and Bowers there, McDavid and Howe assumed they had the wrong room, but Ajan ordered them to stay and, reinforcing the point, ordered Simpson to pull out the "Tec 9" handgun he was carrying. With Simpson blocking one of the room's exits with a chair, Ajan told White, McDavid and Howe to empty their pockets, which they did.

After taking all their money, Ajan forced White to call his mother, Loretta Wogomon, to ask her for $300. When Wogomon thought her son was joking, Ajan took the phone and said, "Ma'am, this is not a joke. . . . You better bring me $300 or I'm going to blow your son's mother f— ing head off." JA 731. After the phone call, Ajan, Simpson and Bowers herded the three men into a white Toyota to meet Wogomon; Ajan and Bowers rode with the three hostages while Simpson followed separately in a red Cavalier and maintained contact with Ajan by walkie-talkie. Wogomon called the police, however, and did not go to the designated meeting place.

When they were unable to find Wogomon, the three defendants stopped at a Costal Mart for refreshments. Before going into the store, Ajan and Bowers, who remained in the car with the three captives, to use the walkie-talkie to tell someone (presumably Simpson in the trail car) to "shoot the son[s] of [ ] bitches if they move." JA 593. When Ajan returned, the group proceeded to the hotel, where six or seven police cars awaited their arrival. Ajan reacted by screaming to his passengers, "She f—ed up now. . . . You're dead mother f—er." JA 594. Rather than stopping at the hotel, both cars headed out of Kingsport, Tennessee, toward Yuma, Virginia.

After crossing into Virginia, Ajan pulled the car into a Texaco gas station, and Simpson, still trailing in his red car, pulled in behind. Ajan forced White to try to call his mother again but to no avail. Resuming their travels, the group drove farther into Virginia, where they eventually stopped at a secluded spot by a river. The testimony

3

diverges as to what happened next.  McDavid testified that one of the defendants placed a gun to his head and threatened to kill him unless he beat up White; McDavid claims that he did beat up White and so was released by the defendants.  White and Howe testified, however, that McDavid and White staged the fight as a diversion to allow them to break away.  All agree, though, that the three victims eventually freed themselves and made their way to the police.

[Doc. 237].

The following additional statement of facts is taken from the "Stipulation of Factual Basis for Plea Agreement," [Doc. 31], filed along with Simpson's plea agreement in case No. 2:03-CR-98.

On October 28, 2003, GEORGE HUBERT SIMPSON was a prisoner in the custody of the Attorney General or his authorized representative.  SIMPSON had been transported to the Sullivan County Jail in the Eastern District of Tennessee upon issuance of a writ, to dispose of State criminal charges.  In the early morning hours of October 28, 2003, GEORGE HUBERT SIMPSON, along with six other prisoners escaped from the Sullivan County Jail.  Approximately 2 hours after his escape, GEORGE HUBERT SIMPSON called a friend, Christopher Spiker and asked Spiker to come to his location and pick him up.  Spiker drove to a church in Sullivan County in the Eastern District of Tennessee, where GEORGE HUBERT SIMPSON and other escapees were waiting.  SIMPSON told Spiker that the group had escaped from the Sullivan County Jail and Spiker agreed to drive the escapees to various locations in Sullivan County, Tennessee.  After the other escapees had been dropped off, SIMPSON remained in the vehicle and Spiker drove him to Spiker's residence where Spiker gave him clothes.  Spiker then drove SIMPSON to a location on Jones Road in Sullivan County, Tennessee, and left him there.  On October 29, 2003, SIMPSON returned to Spiker's residence.  Christopher Spiker drove GEORGE HUBERT SIMPSON into Wise County, Virginia, in an effort to help him avoid recapture in the State of Tennessee.  On November 1, 2003, GEORGE HUBERT SIMPSON was found hiding in the hayloft of a barn on private property in Big Stone Gap, in Wise County, Virginia.  SIMPSON was arrested by the United States Marshals Service at that time and place.

Simpson premises much of his argument in his § 2255 motion on his view of the facts which he claims are established by his own affidavit and the affidavits of Robert Purkey, Matthew Seth

4

Morin, Pamela Hale, Linda McNew, Kenny Kelley, all attached to his motion.  The Court will address these additional "facts" as necessary to the resolution to the claims raised by Simpson in his motion.

## IV.    Standard of Review

This Court must vacate and set aside petitioner's  sentence if it finds that "the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, . . ."  28 U.S.C. § 2255.   Under Rule 4 of the Governing Rules, the Court is to consider initially whether the face of the motion itself, together with the annexed exhibits and prior proceedings in the case, reveal the movant is not entitled to relief.  If it plainly appears the movant is not entitled to relief,  the court may summarily dismiss the § 2255 motion under Rule 4.

When a defendant files a § 2255 motion, he must set forth facts which entitle him to relief. *Green v. Wingo*, 454 F.2d 52, 53 (6th Cir. 1972); *O'Malley v. United States,* 285 F.2d 733, 735 (6th Cir. 1961).  "Conclusions, not substantiated by allegations of fact with some probability of verity, are not sufficient to warrant a hearing."   *O'Malley*, 285 F.2d at 735 (citations omitted).  A motion that merely states general conclusions of law without substantiating allegations with facts is without legal merit. *Loum v. Underwood*, 262 F.2d 866, 867 (6th Cir. 1959); *United States v. Johnson*, 940 F. Supp. 167, 171 (W.D. Tenn. 1996).

To warrant relief under 28 U.S.C. § 2255 because of constitutional error, the error must be one of constitutional magnitude which had a substantial and injurious effect or influence on the proceedings.  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted) (§ 2254 case);

5

*Clemmons v. Sowders*, 34 F. 3d 352, 354 (6th Cir. 1994). *See also United States v. Cappas*, 29 F.3d 1187, 1193 (7th Cir. 1994) (applying *Brecht* to a § 2255 motion). If the sentencing court lacked jurisdiction, then the conviction is void and must be set aside. *Williams v. United States*, 582 F. 2d 1039, 1041 (6th Cir.), *cert. denied*, 439 U.S. 988 (1978). To warrant relief for a non-constitutional error, petitioner must show a fundamental defect in the proceeding that resulted in a complete miscarriage of justice or an egregious error inconsistent with the rudimentary demands of fair procedure. *Reed v. Farley*, 512 U.S. 339, 354 (1994); *Grant v. United States*, 72 F. 3d 503, 506 (6th Cir.), *cert. denied*, 517 U.S. 1200 (1996). In order to obtain collateral relief under § 2255, a petitioner must clear a significantly higher hurdle than would exist on direct appeal. *United States v. Frady*, 456 U.S. 152 (1982).

The Sixth Amendment provides, in pertinent part, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. A defendant has a Sixth Amendment right not just to counsel, but to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Supreme Court set forth a two-pronged test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland* 466 U.S. at 687. As with any other claim under § 2255, the burden of proving ineffective

6

assistance of counsel is on the petitioner. *Virgin Islands v. Nicholas*, 759 F. 2d 1073, 1081 (3d Cir. 1985).

In considering the first prong of the test set forth in *Strickland*, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. A defendant asserting a claim of ineffective assistance of counsel must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).

The second prong of the *Strickland* test requires the petitioner show counsel's deficient performance prejudiced the defense. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. The petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The *Strickland* Court emphasized that both prongs must be established in order to meet the claimant's burden, and if either prong is not satisfied the claim must be rejected, stating:

> Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that

7

course should be followed. Courts should strive to ensure that
ineffectiveness claims not become so burdensome to defense counsel
that the entire criminal justice system suffers as a result.

*Id.* at 697.

## V.  Analysis and Discussion

Simpson has numbered his claims as Issues I through XII in his petition and memorandum

and the Court will refer to them in the same way in this memorandum opinion. Issue I relates to

Count 10 of the superceding indictment which charged a violation of 18 U.S.C. § 924(c)(1) and was

addressed by the Court in its prior memorandum opinion.

### A.  Issues II and III (Case No. 2:03-CR-98)

As noted above, Simpson was charged in No. 2:03-CR-98 with escape in violation of 18

U.S.C. § 751(a). After his motion to dismiss on double jeopardy grounds, [Doc. 18], was denied,

[Doc. 28], Simpson pleaded guilty pursuant to a plea agreement with the United States, [Doc. 30],

and was sentenced to a term of eighteen (18) months imprisonment to be served consecutively to the

sentence in case No. 2:02-CR-71. The indictment in No. 2:03-CR-98 charged:

> On or about October 28, 2003, in the Eastern District of Tennessee,
> the defendant, George Hubert Simpson, a person committed to the
> custody of the Attorney General and his authorized representative
> within the United States Bureau of Prisons, escaped from the Sullivan
> County Tennessee Jail, the facility in which the said George Hubert
> Simpson was confined by direction of the Attorney General of the
> United States and his authorized representative within the United
> States Bureau of Prisons.

[Doc. 1]. Section 751(a) makes it a felony offense for a defendant to escape from the custody of the

Attorney General or his appointed agent "if the custody or confinement is by virtue of an arrest on

a charge of felony, or conviction of any offense". In *United States v. Vanover*, 888 F.2d 1117 (6th

8

Cir. 1989), the Sixth Circuit held that an indictment on a felony escape charge "must allege (1) that the defendant escaped or attempted to escape, (2) from the custody of the Attorney General, his appointed agent, or from a place where the defendant is confined at the direction of the Attorney General, (3) where the custody is by virtue of (a) arrest on a felony charge or (b) conviction of any offense." *Id.* at 1121.

Simpson now argues that the indictment failed to allege "that petitioner's custody was based on an arrest on a felony charge or conviction of any offense" and failed to charge a cognizable federal offense, depriving the court of subject matter jurisdiction to hear the case.[4] Relying primarily on *Vanover* and *United States v. Edrington*, 726 F.2d 1029 (5th Cir. 1984), Simpson argues that the Court must vacate his conviction in No. 2:03-CR-98 (Issue II). He also argues that counsel was constitutionally ineffective for failing to challenge the sufficiency of the indictment (Issue III). Because both Issues II and III turn on the same questions, the Court will consider them together.

The government responds that the indictment is constitutionally sufficient because it "(1) fairly informs the defendant of the charge that he is called upon to defend and (2) provides a sufficient basis for him to plead a double jeopardy bar in any potential prosecution for the same offense," citing *United States v. Resendiz-Ponce*, 549 U.S. 102 (2007). More specifically, the government argues that the language of the indictment that the petitioner was "a person committed to the custody of the Attorney General and his authorized representative within the United States Bureau of Prisons" sufficiently alleges the third element of a felony escape offense because a person is "committed" to the custody of the Bureau of Prisons only after conviction of a federal criminal

---

[4] At the time of Simpson's guilty plea, he admitted that he was, at the time of his escape, "a prisoner in the custody of the Attorney General or his authorized representative," [Doc. 31, Stipulation of Factual Basis]. He did not explicitly admit that he had been convicted of any offense.

9

offense. In reply, Simpson argues that the language relied upon by the government "explicitly charges the second essential element under § 751(a)" but does not explicitly or implicitly also charge the third element. He argues that the government's interpretation of the phrase "committed to the custody of the Attorney General" is mistaken and that a defendant may, in fact, be committed to the custody of the Bureau of Prisons without conviction of an offense.

Even though Simpson did not challenge the sufficiency of the indictment when his case was initially before the Court, that is of no consequence because, even if presented for the first time on appeal, claims of jurisdictional defects in the indictment are not waived. *See United States v. Hart*, 640 F.2d 856, 857 (6th Cir. 1981). But when an indictment is not challenged until appeal the indictment must be liberally construed in favor of its sufficiency. *See United States v. Gatewood*, 173 F.3d 983, 986 (6th Cir. 1999) (citation omitted). To raise a successful challenge to the district court's jurisdiction, a defendant who enters a guilty plea must establish that the face of the indictment failed to charge the elements of a federal offense. *United States v. Martin*, 526 F.3d 926, 934 (6th Cir. 2008).

"[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). As set forth above, in a felony escape charge, the indictment must allege three elements, *see Vanover*, 888 F.2d at 1121. Simpson concedes that this indictment alleges the first and second elements of the offense but argues that the indictment does not sufficiently identify the basis of his confinement or sufficiently identify the nature of the underlying federal offense such as to plead the third element.

10

One thing about this issue is clear. The indictment is not a model of clarity; it is inartfully drawn. It could have clearly set out the elements of a felony escape charge in such a manner that the present argument could not even be made; it did not. Yet, applying the liberal standard set forth above, the court is constrained to agree with the government that the indictment sufficiently sets forth the elements of the felony escape charge. There is no dispute that it sets forth the first two of the required elements and, fairly read, it alleges the third also.

Clearly, the dispute must be resolved by the indictment's language that Simpson was "a person committed to the custody of the Attorney General and his authorized representative within the United States Bureau of Prisons." Although Simpson argues that the language relates only to the second element of the felony escape offense, he partially mischaracterizes the indictment. That he was "committed" to the Attorney General's custody goes beyond the language necessary to allege that Simpson escaped from a place where he was confined at the direction of the Attorney General and his authorized representative (elements one and two). The issue simply becomes this: Does the allegation that Simpson was "committed to the custody of the Attorney General and his authorized representative within the United States Bureau of Prisons" fairly allege that he was in custody "by virtue of . . . conviction of any offense?" The answer is yes.

The government relies primarily on the language of 18 U.S.C. § 3621(a) and *United States v. Rocha-Leon*, 187 F.3d 1157 (9th Cir. 1999). Section 3621(a) provides that a person who has been sentenced to a term of imprisonment after a criminal conviction "shall be committed to the custody of the ***Bureau of Prisons***." 18 U.S.C. § 3621(a) (emphasis added). In *Rocha-Leon*, the defendant challenged his conviction on the basis that he had escaped not from the custody of the Attorney General, but rather from the custody of the Bureau of Prisons, conduct not criminalized by § 751(a).

11

Rejecting his argument as "utterly meritless," the Ninth Circuit noted that while federal statutes had transferred direct custody of federal prisoners from the Attorney General to the Bureau of Prisons, they are still in the "custody" of the Attorney General for § 751(a) purposes, albeit indirectly. *Rocha-Leon*, 187 F.3d at 1159 (noting also that the Bureau of Prisons has "responsibility for imprisoning federal prisoners.")

Simpson correctly observes that other federal statutes also provide for the confinement of persons other than those convicted of an offense to the custody of the Attorney General, quoting extensively from *United States v. Richardson*, 687 F.2d 952 (7th Cir. 1982). That is true enough. *Richardson*, however, does not support Simpson's position. Indeed, the Seventh Circuit in *Richardson* held an indictment with language roughly equivalent to that here "faintly but sufficiently" to charge an offense under § 751(a).[5] *Id.* at 965 (holding that the term "commitment," although a term used to describe a judicial authorization to confine a person, whether convicted of an offense or not, when used in conjunction with an allegation of confinement at a penitentiary, "implies sufficiently that the commitment has followed conviction"). In *Richardson*, the indictment charged that Richardson had escaped from the "United States Penitentiary, Marion, Illinois" where he was being held in lawful custody "by direction of the Attorney General, pursuant to commitments issued under the laws of the United States." *Id.* at 954. Although slightly different semantically, the indictment of Simpson alleges the same - *i.e.* that he was being held in custody by direction of the Attorney General "***within the United States Bureau of Prisons***" pursuant to his "commit[ment]."

The Fifth Circuit has come to a similar conclusion with respect to an indictment that even

_____

[5]   Richardson's conviction was reversed because the Seventh Circuit found the *evidence* insufficient to support the third element of a felony escape conviction, not because the indictment was faulty. Simpson does not challenge the sufficiency of the evidence here.

12

less clearly alleged the third element of the offense. In *United States v. Harper*, the indictment charged the defendant with escape from custody in violation of § 751(a) after "having been committed to the custody of the Attorney General by virtue of a judgment and commitment of the United States District Court . . ." 901 F.2d 471 (5th Cir. 1990). Clarifying its earlier decision in *United States v. Edrington*, finding deficient an indictment which merely alleged that defendant was "confined at the direction of the Attorney General," the Fifth Circuit held that the indictment stating the reason for Harper's confinement, i.e. commitment "by virtue of a judgment and commitment of a United States District Court" sufficiently alleged the underlying basis for Harper's confinement as "conviction of any offense." *See also United States v. McBride*, 498 F.2d 683 (D.C. Cir. 1974) (finding indictment which alleged that defendant "feloniously" escaped from the custody of the Attorney General to be sufficient).

As in *Richardson* and *Harper*, the indictment of Simpson for felony escape, although inartfully so, sufficiently alleges the third element of the offense. When read as a whole, the indictment fairly informs the defendant of the reason for his confinement, that is, commitment to the custody of the Bureau of Prisons for conviction of an offense. Because the indictment sufficiently alleged the elements of the offense, counsel was not deficient for failing to move to dismiss on grounds that the indictment failed to charge a cognizable federal offense over which the Court lacks subject matter jurisdiction. Counsel is under no obligation to raise a meritless issue. *Mapes v. Coyle*, 171 F.3d 408, 413 (6th Cir. 1999) ("[T]here can be no constitutional deficiency in appellate counsel's failure to raise meritless issues.").

## B.    Issue IV–Fourth Amendment Claims

Simpson states his fourth claim as one of ineffective assistance of counsel for counsel's

13

alleged failure "to competently litigate Petitioner's issues under the Forth Amendment." Prior to

trial, counsel moved to suppress, [Doc. 50], all evidence seized on November 26, 2000, and

December 9, 2000, on grounds that the "stop-and-frisk" which led to the discovery of the .38 pistol

was illegal and "all evidence seized beginning with the stop-and-frisk through the statements made

by Defendant are fruits of the illegal stop-and-frisk." He faults counsel for not "competently"

litigating these Fourth Amendment issues, citing *Kimmelman v. Morrison*, 477 U.S. 865, (1986).

Although petitioner divides his Fourth Amendment claims into eight subparts, they all relate to three

discrete events: (1) the November 26, 2000 encounter between Simpson and Officer Michael

Hickman at the Coastal Mart in Kingsport; (2) the November 26, 2000 consent search of petitioner's

residence; and (3) the December 9, 2000 search of petitioner's residence pursuant to a search warrant

issued upon the affidavit of Detective Glen Cradic. The Court will address each of these events in

turn.

### 1.    The November 26 Encounter at Coastal Mart

As noted above, Simpson first encountered Officer Hickman at the Coastal Mart in

Kingsport at approximately 10:00 p.m. on November 26, 2000. While the Sixth Circuit's opinion

generally described the facts, more detailed findings of fact were made by the Magistrate Judge after

an evidentiary hearing was conducted on Simpson's motion to suppress and a fuller discussion of

those facts is necessary for the resolution of this claim.

Simpson's co-defendant, Allen Ajan, was arrested by Officer Eric Alford of the

Kingsport Police Department on November 26, 2000, for driving under the influence of alcohol.

During the search of Ajan's person and car, a quantity of drugs and a cell phone were located by the

arresting officer. Officer Alford pushed "send" on the cell phone, which had the effect of ringing

14

the last number called from that phone. The conversation was at first angry and confrontational with neither party identifying himself to the other and the call was terminated. Alford immediately re-placed the call, and this time the conversation apparently was somewhat calmer. During the course of the conversation, all Alford learned was that he was speaking to George Simpson. Alford "spun an ingenious tale," telling Simpson that he had been riding around with Ajan, that Ajan was highly intoxicated, that he had passed out behind the wheel, that there were drugs in the car, and that he was afraid something bad might happen. Alford, who clearly had not identified himself as a police officer, asked Simpson for assistance. After some conversation, Simpson suggested that they meet at the Coastal Mart in Kingsport.

Alford then contacted Officer Mike Hickman and told him what had just transpired, *i.e.*, that he had talked to Simpson on the cell phone, that Simpson was going to meet them at the Coastal Mart, that Hickman should take up a position of surveillance at the Coastal Mart, and that Ajan had told Alford that all the drugs in the car belonged to Simpson.

Hickman, in uniform and driving a marked cruiser, established a position of surveillance at the Coastal Mart parking area at approximately 10:00 p.m. After about 45 minutes, Hickman noticed two men walking up Bloomingdale Road out of the darkness. As they came into view, Hickman observed that both men were wearing camouflage clothing, including overalls and heavy camouflage jackets. One of the men had a pair of binoculars hanging around his neck. Although Hickman did not know Simpson by sight, he thought one of the men might be Simpson but he was also concerned that their attire, their mode of arrival (on foot) and the lateness of the hour, indicated that they might have robbery on their minds. The two men entered the store, followed by Hickman. The two men stayed in the store but a few minutes and then exited, as did

15

Hickman. Outside the store, Hickman approached the two men in a casual manner, asking their names. One of the men identified himself as George Simpson and the other identified himself as Vance Bowers. Hickman asked Simpson if he could pat him down for weapons; Simpson agreed, raising his arms to facilitate the pat-down and advised Hickman that he had a pistol in his overall pants. Hickman retrieved the weapon, a .38 caliber revolver. Simpson told Hickman that his gear and clothing were for hunting and he denied knowing anything about Ajan's accusations that the drugs in Ajan's car belonged to him.

Simpson was asked if he would give permission to search his house, and he gave such permission, executing a written form to that effect furnished by a Sullivan County Deputy Sheriff, who had been called because of the proximity of the Coastal Mart to the city limits. Deputies searched the house pursuant to Simpson's consent and a drug sniffing dog accompanied the deputies during their search. The officers observed hunting rifles, drug paraphernalia, scales, baggies, and found two bags of marijuana. The officers seized the drugs and the drug paraphernalia. Simpson was then arrested for possession of less than one-half ounce of marijuana, possession of drug paraphernalia, and for going armed.

Simpson premises his argument about the November 26 encounter at Coastal Mart on allegations contained in his own affidavit and that of Robert Purkey, who testified at trial. Purkey claims that he accompanied Simpson to the Coastal Mart on November 26, 2000, sometime after 9:00 p.m. Upon arrival, they observed a police car in the parking lot and the officer, Mike Hickman, got out of the car and followed them inside the store. Purkey claims that as soon as he and Simpson exited the store Hickman approached and demanded that they produce identification. He claims Hickman jumped in front of Simpson and stated "I said to produce your ID." Purkey claims that the

16

"tone of voice" used by Hickman "scared [him] into producing [his] ID." According to Purkey, Hickman then grabbed Simpson and started searching him, made him take off his coveralls and then found a pistol. According to Purkey, he contacted Simpson's attorney and told him he was willing to testify at the evidentiary hearing; however, counsel told him he need not show up.

Simpson's affidavit is much the same. He claims that after he and Purkey left the Coastal Mart, Hickman approached and "demanded us to produce our ID. Hickman jumped in front of me and put his finger in my chest and stated 'I said to produce your ID.'" Given Hickman's tone of voice, Simpson claimed he was "scared" and felt he had to produce his ID.[6] According to Simpson, Hickman grabbed him by the arms, took him to the police car, and searched him. Hickman made him remove the coveralls and then found the revolver.

As an initial matter, the Court will not consider Simpson's affidavit. Simpson has previously waived his right to testify either at the evidentiary hearing or at the trial of this case. A defendant's right "to testify at trial is a constitutional right of fundamental dimension and is subject only to a knowing and voluntary waiver by the defendant." *United States v. Webber*, 208 F.3d 545, 550 (6th Cir. 2000). Although "the right to testify is personal to the defendant" who retains "the ultimate decision whether to testify [,] . . . when a tactical decision is made not to have the defendant testify, the defendant's assent is presumed." *Id.* at 550-51. Absent "statements or actions from the defendant indicating disagreement with counsel or the desire to testify, the trial court is neither

---

[6]    Purkey, Simpson's cousin, testified at trial, called as a witness by the attorney for co-defendant Vance Bowers. Purkey testified that he and Simpson were approached by "some officers" when they left the Coastal Mart and was asked his name. According to Purkey's trial testimony, he identified himself "either as Bobby or Robert Purkey" and produced his driver's license. He never mentioned a coercive tone used by Hickman. He further testified that Vance Bowers was not present, testimony the jury obviously did not credit.

required to . . . inquire whether the defendant knowingly and intentionally waived the right to testify, nor ensure that the defendant has waived the right on the record." *Id*.; see also *Hodge v. Haeberlin*, 579 F.3d 627, 639 (6th Cir. 2009) (holding that the right to testify, though fundamental, can be presumed waived "from a defendant's conduct alone"). "A defendant who wants to testify can reject defense counsel's advice to the contrary by insisting on testifying, communicating with the trial court, or discharging counsel." *Webber*, 208 F.3d at 551. A defendant must alert the court "that he desires to testify if there is a disagreement with defense counsel regarding whether he should take the stand." *Webber* at 557 (citing *Pelzer v. United States*, 1997 WL 12125 at *2 (6th Cir. Jan. 13, 1997)). Here, Simpson never insisted on testifying, never communicated a desire to testify to the Court and never discharged counsel. He, therefore, waived his right to testify either at the evidentiary hearing or at the trial.

There are three types of reasonable, and thus permissible, warrantless encounters between the police and citizens: "(1) consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked questions; (2) a temporary involuntary detention or *Terry* stop which must be predicated upon 'reasonable suspicion'; and (3) arrests which must be based upon 'probable cause.'" *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008) (citing *United States v. Alston*, 375 F.3d 408, 411 (6th Cir. 2004).

Simpson argues that Hickman lacked "reasonable suspicion to justify the stop and seizure of petitioner." Simpson argues that Hickman was simply suspicious of him because he was dressed in camouflage coveralls and that Hickman was not even sure if he was the person he (Hickman) was looking for. However, the initial encounter between Hickman and Simpson was noting more than a consensual encounter initiated by Hickman who asked Simpson to produce

18

identification. According to Hickman, Simpson consented. The Magistrate Judge credited Hickman's testimony and Purkey's affidavit does not indicate to the contrary. Both Purkey and Simpson claim that Hickman's "tone" made them feel coerced into producing their identification. Such a conclusory allegation, however, without any elaboration, is not sufficient to change this from a consensual encounter to a *Terry* stop.

Furthermore, even if Simpson is correct and the confrontation between Simpson and Hickman was a *Terry* stop, there was in fact reasonable suspicion for the stop. Simpson argues that Hickman's suspicions of the petitioner were the result of him being dressed in camouflage coveralls and that Hickman was not even sure if Simpson was the person he was looking for. Hickman, however, knew far more. Ajan had been arrested earlier in the evening and had identified Simpson as the owner of methamphetamine found in Ajan's car, *i.e.*, Simpson was suspected of drug trafficking, and that the drugs found in Ajan's car belonged to Simpson. Hickman was also expecting a person identified as Simpson based on Alford's telephone conversation with Simpson to appear at the Coastal Mart. Hickman then observed two men, one of whom was indisputably Simpson, walking to the area of the Coastal Mart wearing camouflage clothing, including overalls and heavy camouflage jackets. Given the lateness of the hour, Hickman was reasonably concerned about these two individuals, especially in view of their attire and the fact they arrived at the Coastal Mart on foot.

These circumstances clearly establish "reasonable suspicion," based on articulable facts, that criminal activity was afoot, *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Terry v. Ohio*, 392 U.S. 1 (1968), allowing Hickman to stop and briefly detain Simpson for investigative purposes. This is especially true given that the reasonable suspicion standard is not particularly onerous. *See,*

19

*e.g., United States v. Harris*, 192 F.3d 580, 584 (6th Cir. 1999).

If reasonable suspicion to stop a suspect exists, as it did here, the officer is entitled to conduct a frisk and limited search for weapons to protect himself. *United States v. Hensley*, 469 U.S. 221 (1985); *Terry*, 392 U.S. at 29. Hickman thus had a legal right to search Simpson and Purkey for weapons to protect himself, with or without Simpson's consent. Purkey's claim that Simpson did not consent is therefore irrelevant. There was no Fourth Amendment violation related to the initial encounter between Simpson and a law enforcement officer on November 26, 2000.

Simpson also argues that the removal of his coveralls exceeded the scope of a permissible *Terry* search. Hickman, however, indicated that Simpson advised him that he had a pistol in his overall pants, suggesting that he never required Simpson to remove his coveralls. Hickman's testimony was credited by the Magistrate Judge and this Court sees no basis upon which a reasonable contrary conclusion could be reached. Nothing in this record suggests that the Court would have credited either Simpson's or Purkey's testimony on this point had they testified.

There simply was no Fourth Amendment violation related to Hickman's initial encounter with Simpson on November 26, 2000.

### 2. The November 26 Search of Petitioner's Residence

Petitioner makes a very lengthy argument here about, as he sees it, the illegal search of his residence on November 26, 2000, and he faults counsel for not competently litigating those issues. Hickman, however, testified that Simpson consented to the search, Simpson says otherwise and is supported by Purkey. Although Purkey and Simpson did not testify at the evidentiary hearing, the Magistrate Judge fully credited Hickman's testimony on this point and Simpson points to nothing in the record which causes this Court to conclude that the Magistrate Judge would have come to a

20

different conclusion had Purkey testified. Purkey is a family member and his testimony at trial was clearly not believed by the jury. There is nothing here to suggest that any alleged deficiency by counsel would have resulted in a different finding by the Magistrate Judge.

Simpson commits a significant portion of his memorandum to "evidence that would tend to contradict Hickman's testimony with respect to petitioner's consent . . ." It is true that the government could not produce a written consent form and the record contains no written consent evidencing Simpson's agreement for the search. That very point was made, however, to the Magistrate Judge who did not find it sufficient to overcome Hickman's testimony. Hickman testified that Simpson consented to the search; however, in an affidavit of complaint filed in state court, Hickman testified that Simpson's wife(girlfriend), Carla Lovell, signed the consent form. Simpson has previously filed an affidavit in this case in which he admits that he does not know if Lovell signed the consent form. [*See* Doc. 307-2]. Lovell's consent would have been sufficient consent for the search. *See United States v. Penney*, 576 F.3d 297, 308(6th Cir. 2009)(live-in girlfriend has authority to consent to a search of a residence). Counsel was not deficient in litigating this issue.

### 3.    The December 9, 2000 Search Warrant

The December 9, 2000 search warrant was issued by a state court judge based upon the affidavit of Glen Cradic, assigned as a Special Agent with the Second Judicial Drug Task Force. The affidavit set out Cradic's significant experience in narcotics investigations over an eleven year period as a law enforcement officer. The affidavit recited, among other things, that a confidential informant had provided information to the drug task force, based on his/her personal knowledge, that Ajan was involved in trafficking marijuana and other illegal drugs. That same confidential informant identified George Simpson as "Ajan's partner" in drug distribution and that Ajan and Simpson were

known to carry guns on a regular basis. The affidavit recited the information obtained by officers from the November 26, 2000 arrest of Ajan for drunk driving and the circumstances of Simpson's encounter with Officer Hickman at the Coastal Mart on November 26, 2000, as well as the later consensual search of Simpson's residence. The affidavit further recited the events of December 9, 2000 and the interview of White, who told the officers that Ajan, Bowers and Simpson had rushed into their motel room and that Simpson "had a firearm that looked like an Uzi submachine gun." Both Howe and McDavid had also been interviewed and substantiated White's account, including the specific involvement of Simpson and his possession of the items to be search for.

Simpson now claims that counsel was ineffective for not requesting a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), based on an allegation that Cradic knowingly included false statements in the warrant affidavit. More specifically, Simpson argues that the inaccuracies in the affidavit included: (1) a statement by Cradic that an investigation into the narcotics trafficking activities of Ajan, Simpson and Bowers had been ongoing for over a year; (2) statements in the affidavit that agents had confirmed all of the information through personal knowledge, surveillance and investigation; (3) that nothing in the warrant indicated that the confidential informant was credible and reliable; (4) that Ajan told Alford that the narcotics in his automobile belonged to George Simpson; and (5) the circumstances related to Simpson's encounter with Hickman on November 26, 2000 at the Coastal Mart and the subsequent consensual search of his house. Simpson argues that the first statement is false because Cradic testified at the detention hearing that a confidential informant provided information concerning the alleged drug activities of Ajan and Bowers but that no investigation began at that time. With respect to the second statement, he argues that if agents had in fact confirmed information to be true and reliable "there would be documentary

22

evidence via audio, video, photos or relevant reports to support the position." As to the fourth statement, Simpson argues that Alford stated that Ajan did not make those statements, citing page 29 of the transcript of testimony at the suppression hearing conducted by the Magistrate Judge. The testimony Simpson points to,however, is unclear and was given by Alford at the detention hearing in the context of questions about Ajan's cell phone. Alford was asked: "And Mr. Ajan gave you some statements, something to the effect of, well, that's Simpon's?" Alford answered "I don't recall that." With respect to the fifth allegedly false statement, Simpson again argues that Hickman's testimony concerning the circumstances of the November 26, 2000 encounter at the Coastal Mart is not true as noted above.

In order to be entitled to a *Franks* hearing, a defendant must make a "dual showing . . . which incorporates both a subjective and an objective threshold component." *Franks*, 438 U.S. at 155-56. First, the defendant "must make a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant." *Id*.; *see also United States v. Charles*, 138 F.3d 257, 263-64 (6th Cir. 1998). Second, the offending information must be essential to the probable cause determination; if the offending information is excluded and probable cause still remains, a *Franks* hearing is not required. *Franks*, 438 U.S. at 155-56.

Simpson cannot meet the first requirement of *Franks, i.e.*, that false statements were knowingly and intentionally made or with reckless disregard of the truth. Even assuming that the statements were inaccurate, Simpson has offered nothing to indicate that they meet this standard and thus could not have made the necessary substantial preliminary showing. As a result, counsel was not ineffective for failing to seek a *Franks* hearing. Likewise, Simpson cannot meet the second part

23

of the *Franks* test.  Even if all of the information seen as offending by Simpson were redacted from the affidavit, there would still be sufficient probable cause for the issuance of the warrant.  In fact, the information provided by White, McDavid, and Howe would have alone been sufficient to justify the issuance of a search warrant for Simpson's residence for drugs and firearms.

### C.      Issue V– Failure to Investigate And Call Exculpatory Witnesses

Petitioner claims that counsel was ineffective because petitioner provided the name, address and phone number of over 25 witnesses and the substance of their testimony to counsel prior to trial and that counsel failed to interview and/or investigate and none of the witnesses were called to testify at trial.  These witnesses, according to Simpson, "would have testified that there was no kidnapping of the victims and that the allegation of the kidnapping was a scam perpetuated by White to obtain money from White's mother, Loretta Wogoman." [Doc. 375 at 41].  He claims that counsel "never contacted any of these witnesses" and, without interviewing them, "simply decided not to call them to testify," a decision that was "objectively unreasonable." [*Id*. at 42].  Petitioner identifies seven (7) of these potential witnesses by name in his petition--Matthew Seth Morin, Pam Hale, Linda McNew, Kenny Kelley, Robert Purkey, Rebecca Lovell Stone, and Patricia Vaughn.  Simpson has submitted affidavits from Morin, [Ex. 9], Hale, [Ex. 10], McNew, [Ex. 11], Kelley, [Ex. 12], Purkey, [Ex. 1], and Vaughn, [Ex. 14].[7]

It is clearly established that counsel has a duty to "make reasonable investigation," *Strickland*, 466 U.S. at 691, and is obligated to "investigate all witnesses who may have information

_____

[7]      As noted above, Simpson has submitted his own affidavit as well.  With respect to any claim that his testimony, either separately or in combination with the testimony of others, would have affected the outcome of the trial, the affidavit has not been considered.  Simpson waived his right to testify at trial and, in any event, does not allege that he would have testified at trial if called as a witness.

24

concerning his or her client's guilt or innocence." *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). As petitioner acknowledges, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. Decisions about whether to call particular witnesses at trial are generally matters of trial strategy. Judge Batchelder summarized the applicable legal principles in her dissent in a recent Sixth Circuit opinion:

> The decision to call or not call certain witnesses is exactly the type of strategic decision that the courts expect attorneys to make. *See United States v. Best*, 426 F.3d 937, 945 (7th Cir.2005) ("[A] lawyer's decision to call or not to call a witness is a strategic decision generally not subject to review. The Constitution does not oblige counsel to present each and every witness that is suggested to him." (citations and internal quotations omitted)); *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir.1998) ("The decision not to call a particular witness is typically a question of trial strategy that appellate courts are ill-suited to second-guess."); *Blanco v. Singletary*, 943 F.2d 1477, 1495 (11th Cir.1991) ("The decision as to which witnesses to call is an aspect of trial tactics that is normally entrusted to counsel."); *Tosh v. Lockhart*, 879 F.2d 412, 414 (8th Cir.1989) ("[T]he decision not to use alibi testimony may reflect the reasonable exercise of judgment in view of the attorney's concern that the testimony would be conflicting ... or otherwise unfavorable." (internal citations omitted)); *cf. Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ("[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (citation omitted)).

*Boykin v. Webb*, 541 F.3d 638, 649 (6th Cir. 2008) (Batchelder, J., dissenting). Furthermore, "[a] defense counsel has no obligation to call or even interview a witness whose testimony would not have exculpated the defendant." *Millender v. Adams*, 376 F.3d 520, 527 (6th Cir. 2004).

Ordinarily, claims of failure to investigate and/or call potentially favorable witnesses is the kind of claim that would result in this Court ordering an evidentiary hearing. "In reviewing

25

a § 2255 motion in which a factual dispute arises, 'the *habeas* court must hold an evidentiary hearing to determine the truth of the petitioner's claims ... [and] [t]he burden on the petitioner in a *habeas* case for establishing entitlement to an evidentiary hearing is relatively light.'" *Valentine v. United States*, 488 F.3d 325, 333 (6th Cir. 2007) (citing *Turner v. United States*, 183 F.3d 474, 477 (6th Cir. 1999)). However, an evidentiary hearing is not required if the record conclusively shows that the petitioner is entitled to no relief, as when "the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Valentine*, 488 F.3d at 333 (citing *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999).

As an initial matter, the allegation that petitioner informed counsel of over 25 witnesses and the substance of their testimony fails, in large part, because except for the seven above, petitioner has not identified those witnesses, has not stated the substance of their testimony, has not shown their willingness to testify, and has not shown how their testimony would even potentially have affected the outcome of the trial. And, even though he has identified Stone by name, he has not submitted any affidavit from her or outlined the nature and substance of her testimony. The Court will, therefore, only consider the six affidavits actually submitted in support of this claim. The Court will now briefly summarize the contents of the affidavits, all of which purport to report statements allegedly make by White and Howe.

A. **Robert Purkey** [8]

Purkey had "several conversations" with White concerning the alleged

---

[8] Simpson only attached pages 1, 5 and 6 of Purkey's affidavit to his original petition. After the deficiency was noted in the government's response, Simpson attached the full six page affidavit to his reply, [see Doc. 419-1].

kidnapping and each time White stated that the "kidnapping never happened."[9]  Since Simpson's

trial, Purkey has met Ricky Howe and had several conversations with Howe and White about the

alleged kidnapping after Simpson's trial.  White and Howe have stated that they "were never

kidnapped or threatened with any firearms."  White and Howe stateed that they were with White's

girlfriend and McDavid at Westside Inn smoking crack cocaine and using methamphetamine

intravenously.  They called several possible suppliers and located an eight ball of cocaine.  White

called Ajan and Bowers to come to the motel and give them a ride.  After Ajan and Bowers did not

appear, Howe asked Simpson to come and give them a ride.  Simpson did not show up and Howe

called a cab and left with McDavid to pick up the cocaine.  White stayed at the motel with his

girlfriend.  White stated that he smoked crack cocaine with his girlfriend until Howe and McDavid

returned and they all used the cocaine intravenously.  Ajan and Bowers arrived after the cocaine was

gone and Simpson arrived even later.

White and Howe stated that White tried to extort his grandfather for money

to buy meth but his grandfather would not give him any money.  White's girlfriend and Simpson did

not want any part of extorting White's family for money and left the motel.  White lied to his mother

and tried to extort her for money to buy meth and told her he was being robbed, held hostage and that

he needed some money.  McDavid, Ajan and Bowers left the motel and went to several places trying

to borrow money.  Ajan took White and Howe to "meet someone for some meth" when they returned

to the motel, they saw police cars, White got scared, and told everybody that they had to get out of

Kingsport."  "[T]hey went to the river and did all the meth White had received."  White and

---

[9]    During his trial testimony, Purkey was asked about what White had said to him about the alleged
kidnapping.  Purkey's response was "I don't remember his exact words or nothing."  He testified further that
the kidnapping, according to White, "didn't happen" and "it was a joke."

McDavid then had a fight and Ajan and Bowers drove off and left them. White and Howe stated that they lied to the police and White said "that he knew exactly what to say to keep from going to jail." White and Howe stated that White tried several times to extort Ajan for $10,000 in exchange for White not showing up to testify in court. Ajan would not pay the money. Howe and White repeatedly went over their testimony prior to Simpson's trial "so it would match." Howe said that he and White committed perjury during Simpson's trial.

### B.    Matthew Seth Morin

Morin was visited by White at his home approximately two days after the alleged kidnapping. White said that he, Howe, and McDavid "was never threatened, robbed or kidnapped, and there were no firearms involved on December 9, 2000." White described the incident in detail. White said that "everything was his idea and it was all a joke, nothing more." White, his girlfriend, Howe and McDavid were at the Westside Inn Motel "smoking crack and using methamphetamine intravenously until they ran out of methamphetamine." White began calling "everybody they knew to get some more methamphetamine on front" but were unable to get more methamphetamine without the money. White called "everybody he knew" trying to borrow money so he could get some more meth. "[T]hey found some powder cocaine they could obtain on front" and McDaivd and Howe called a cab and later returned with an eight ball of cocaine. White and his girlfriend stayed at the motel and smoked crack cocaine until McDavid and Howe returned. They used all the cocaine intravenously and began making additional calls to try to obtain methamphetamine when Ajan, Bowers and Simpson arrived. White called his grandfather and told him he was being robbed and needed some money in an effort to get money from his grandfather to purchase methamphetamine. White's girlfriend and Simpson "didn't want nothing to do with it" and

28

left.  White said he "never seen Simpson or the girl again that morning after the two left the motel." White's grandfather didn't believe him and refused to give him money.

White then called his mother with the same story.  Although his mother did not initially believe him, White "finally convinced her and then arranged a meeting place with his mother to go and pick up the money."  White's mother didn't show up but White was finally able to find some methamphetamine on front and left to meet the source.  After obtaining the methamphetamine, they went back to the motel room.  When they saw the police cars, White panicked and "told the others to get him out of Kingsport until he could figure out what to do."  After talking to his mother again, White "had the others take him to the river in Virginia so he could hide and get off the roads and they could do the methamphetamine."  White and McDavid got in a fight and "McDavid busted White's head open."  When the fight started, Ajan and Bowers left them at the river and they did not see Ajan and Bowers again.  White went up to a house and asked to use a phone but the occupant would not let him use the phone.White stated "that they all come up with the story that they were robbed and dropped off at the river, while walking the River Road."  They "told the police the story to keep from going to jail."

About a year later, on December 31, 2001, Howe made the same detailed statements to Morin that White had made one year earlier.  Howe stated that he "was never threatened, robbed or kidnapped and there were no firearms involved at any time on December 9, 2000."  Howe said that White "would come to his house and try to get Howe to rig their testimony so their testimony would match when it came time to testify in court."  White "was trying everything he could think of to keep the truth from coming out so White would not go to jail for scamming his mother."

29

C.    **Pamela Hale**

White and Howe were at Hale's house and "stated that they were never threatened, kidnapped or held hostage against their will on December 9, 2000," White and Howe said that a "kidnapping never took place and no firearms was ever involved." It was just a joke and no one was meant to get in trouble. White, Howe and McDavid were at the West Side Inn with a girl and they were all using methamphetamine intravenously and smoking crack cocaine. When the meth was gone, White got on the phone trying to locate more meth. Everybody wanted money first and would not front him any meth. White said that he did find an eight ball of cocaine that he could get on front but they had to find a ride to get the cocaine. They called one of their friends and Ajan and Bowers were there. White and Howe asked Ajan and Bowers to come to the motel and give them a ride. Ajan and Bowers did not show up and Howe called other friends and one of his friends placed a three way call to Simpson. Howe asked Simpson to come to the motel. When neither Ajan, Bowers nor Simpson arrived, Howe called a cab. Howe and McDavid left in a cab to pick up the eight ball of cocaine and White and the girl stayed at the motel. White said he smoked crack cocaine with the girl until Howe and McDavid returned.

White and Howe stated that when Howe and McDavid returned, they all did cocaine intravenously. Ajan and Bowers arrived after the cocaine was gone and Simpson then arrived. White wanted more meth and got on the phone trying to find it. No one would front him any meth. White and Howe stated that White called his grandfather and lied to him by stating he "was being kidnapped and held hostage" and needed money for his release. White's grandfather refused. After Simpson heard White on the phone with his grandfather, "Simpson wanted to leave the motel." The girl present "followed Simpson out the door and they left." White and Howe stated

30

they did not see Simpson again after he left the motel.  White then called his mother and tried to extort her for the money, telling her he was being kidnapped and held hostage and needed money for his release.  He arranged a "rendezvous" with his mother and White, Howe, McDavid, Ajan and Bowers left the motel to meet White's mother.  White's mother did not arrive and Ajan took them to one of their friend's home to try to borrow money.  The friend would not loan money for meth. After trying several places, White finally found an eight ball of meth that he obtained on front and they returned to the motel.  When they saw the police cars, White panicked and told Ajan "to get him out of Kingsport so White could hide from the police."  Ajan and Bowers took White and Howe to the river in Virginia, where they used the meth White had obtained.  After the meth was gone, McDavid and White started arguing because White had attempted to extort money from his family and then got into a fight.  Ajan and Bowers "jumped in the car and drove off" and did not return to pick up White and Howe and they never saw them again that morning.  According to White and Howe, they, along with McDavid, "thought it would be best to lie to the police and state that they were dropped off at the river after being kidnapped."  White said he "knew exactly what to say to keep from going to jail" and was going to court and lie so his mother would not find out he tried to extort money to buy meth.  White and Howe were at Hale's house going over what they were going to testify about in court.

       White said that he and his father, Ernie White, were trying to extort Ajan for $10,000 and were going to use the money to buy a kilogram of meth.  White said Ajan would pay the money or he would go to court and lie and send him to prison for life.  Hale contacted Simpson's attorney, and told him everything that White and Howe had stated.  Although the attorney said that he "would be in contact with [her] before Simpson's trial," he never contacted her.  She later called

the attorney back and was told "that if I testified it would have a detrimental effect on Simpson's trial instead of helping him."

### D.    Linda McNew

In September, 2001, at approximately 3:00 a.m., Bowers, Jamie Bledsoe, and Rochelle Vaughn, came to her house with information that Lynn White wanted to speak to Allen Ajan, that White was with Simpson, and wanted money to leave town so he could avoid having to be present to testify. White wanted $10,000. A few days later, McNew and Ajan met with White at the Waffle House along with White's girlfriend and a woman named "Bobby." Simpson was also present. White again demanded $10,000 "to leave town and not testify to what Officer Frank Light had told him to testify to." On September 11 or 12, 2001, the father of Lynn White called McNew and demanded $10.000. The call originated from the phone of George Simpson, who was identified through caller I.D. White made threats that if Ajan did not give him $10,000 he would make sure his son Lynn White testified and put Allen Ajan away for life. White demanded a meeting at a public place the next night, but Ajan was arrested before the meeting could take place. McNew made attorney Frank Slaughter, who represented Ajan, aware of the information and was present at trial; however, she was never called as a witness. Prior to the trial, McNew spoke with McDavid on the phone and McDavid informed her that he had not been kidnaped.

### E.    Kenny Kelley

According to Kelley's affidavit, "White stated that a kidnapping never happened." White also stated that "there were no firearms present," and that he lied to get money from his mother for drugs. White was at a motel smoking crack and using meth with Howe and McDavid, ran out of drugs, and called Simpson, Bowers and Ajan for a ride to pick up some cocaine.

When no one arrived, Howe and McDavid called a cab and went after the cocaine. When Howe and McDavid returned, they did the cocaine intravenously. Simpson, Bowers and Ajan then showed up. White said that when he could not get money for meth, he called his mother and lied to her and told her he was being robbed and needed money before he would be released. Simpson did not want anything to do with the attempt to get money from White's mother and left the motel. White said they all then left the motel and went "to a few places" to get money for meth. After obtaining meth, they returned to the motel, saw the police cars, got scared and told Ajan to take him to the river where they could do the meth. McDavid was mad at White and they got into a fight at the river. When the fight started, Ajan and Bowers drove away and left them at the river. White said "they all lied to the police." White said he "knew exactly what to say to keep from going to jail because he had been through the system before." Kelley "know[s] that White, Howe, and McDaivd were never kidnapped." White confessed several times that he had lied to his mother to get money for drugs.

F.     Patricia Vaughn

During several conversations with Howe, Howe stated that he, White and McDavid "were never kidnapped or threatened with a firearm in any way." Howe said that he, White and McDavid were at a motel using methamphetamine intravenously. White got on the phone and located some cocaine and called Ajan and Bowers for a ride. Howe had someone call Simpson for a ride also. When they did not arrive, Howe and McDavid took a cab and went after the cocaine. After they returned they all used the cocaine and then Simpson, Ajan and Bowers arrived. Howe said White called his grandfather and lied and told him he was being held hostage and needed money before he would be released. White also called his mother and tried to get money to buy meth and

33

lied to her that he was being held hostage and would not be released until he received the money. Simpson did not want to get involved and left the motel. Howe, White, McDavid, Ajan and Bowers left the motel and found some more meth. When they returned to the motel, they saw police cars and White panicked and told Ajan "to get him out of Kingsport." Ajan took them to the river so they could use the meth. Howe said White and McDavid got into a fight and Ajan and Bowers left them. White said they should all tell the police that they were robbed and dropped off at the river to keep from going to jail. Howe said he and White repeatedly went over their testimony "so they would testify to the same thing in court." Vaughn contacted Simpson's attorney and told him what Howe had said. The attorney was not interested and would not investigate these matters any further. The attorney said the evidence against Simpson was overwhelming and that the government had offered a plea agreement for 15 years.

These affidavits and Simpson's claims related to them raise the kind of issues which would ordinarily cause this Court to order an evidentiary hearing on the claim that counsel did not interview and/or call exculpatory witnesses. This case is different, however, for several reasons. First of all, the affidavit submitted by Purkey is not relevant on the issue before the Court. The question is whether or not counsel was ineffective for failing to interview witnesses and call those witnesses at trial. Purkey's purported testimony as set forth in his affidavit concerning his conversations with Howe and White and certain admissions they may have made all deal with conversations "since Simpson's trial." Counsel could not be faulted for failing to interview Purkey about these conversations or failing to call Purkey as a witness at the trial since these were matters which arose after the trial. To the extent Purkey's testimony deals with "newly discovered evidence" this § 2255 motion is not the way to raise that claim. McNew's affidavit deals largely with the

34

government's case against Allen Ajan and she never indicates that she was at the time, or is now, willing to testify in Simpson's behalf.

That leaves the affidavits of Kelley, Vaughn, Hale and Morin, each of whom claims that he would have testified to the contents of his or her affidavit at the trial of Simpson. Both Hale and Vaughn, however, indicate that they discussed their testimony with Simpson's counsel and it is clear that counsel made a decision not to call them as witnesses; indeed, Vaughn indicates that counsel told her to leave the courthouse during the trial. As Simpson acknowledges, decisions made by counsel not to call a witness after interviewing that witness are generally matters of trial strategy and "virtually unassailable." Furthermore, the affidavits are filled with conclusory statements and with much hearsay. For instance, testimony by any of these witnesses that White and/or Howe said they were not "kidnapped" was likely inadmissible as containing a legal conclusion. The federal kidnapping statute provides that "[w]hoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof" when the person was transported in interstate commerce commits the crime of kidnapping. 18 U.S.C. § 1201(a). The common understanding of the term "kidnap," involves the situation where one is taken hostage and held for ransom. The federal kidnapping statute is much broader than that common understanding of the term. Thus statements by any person, including the victims of the kidnapping alleged in this indictment, were not competent opinions on whether or not they were in fact kidnapped.

Furthermore, as indicated above, the affidavits contain considerable hearsay which would not have been inadmissible at trial and the bulk of the affidavits contains information that was merely information which might have been used to impeach either White or Howe during their

testimony and likely would not have been admissible unless White and Howe denied their prior conduct or statements. To the extent admissible, the information is largely cumulative to the testimony of Purkey at trial that White said the events of December 9 "never happened" and it was all a "joke." Finally, the affidavits are remarkably similar with respect to the details of conversations the various affiants had with Howe and/or White, suggesting that these witnesses have been ***coached*** or that the affidavits were drafted by the same person. In addition, the affidavits were prepared and signed by Morin and Kelley eight or nine years after the events reported in those affidavits. In addition, it is inconceivable to the Court that Simpson would have maintained his silence about the existence of these witnesses or their potentially exculpatory testimony throughout these proceedings. He never called these matters to the attention of the Magistrate Judge or the District Judge who tried the case, never mentioned these matters during his many opportunities to allocute before the Court, did not raise the matter in any of the correspondence to counsel produced by him or any of his *pro se* pleadings in the Sixth Circuit and never sought a new trial despite his obvious knowledge and ability to file *pro se* pleadings. The Court simply finds that all of these factors, when considered together, make Simpson's claims wholly incredible and no evidentiary hearing is required. Even if, somehow, the Court were to find that counsel had rendered ineffective assistance of counsel, given the issues of credibility and the limited nature of the admissibility of the testimony, Simpson can point to nothing in the record here which would have changed the outcome of the trial had these witnesses been interviewed and/or called as witnesses by defense counsel.

There may be a more important reason why Simpson's claim here fails. All of this evidence is directed to the kidnapping and firearm in furtherance counts(Counts 9 and 10). The Court has vacated the firearm count and vacation of the kidnapping count would have absolutely no

impact on Simpson, especially in view of the Court's prior order vacating his conviction and sentence as to Count 10. Simpson was sentenced to concurrent 48 month sentences for the drug conspiracy and kidnapping counts as well as concurrent three years terms of supervised release. Even if the Court were to vacate Count 9, Simpson would still face the very same term of imprisonment and same term of supervised release. In addition, he would suffer all of the same collateral consequences because of the other convictions, including the loss of his civil rights. Count 9 has simply become irrelevant with respect to the consequences of these convictions to Simpson.

For these reasons, the Court concludes that Simpson's claim, Issue V, lacks merit and will be overruled.

### D.    Issue VI –   IAC Sentence Exposure

With this claim, petitioner argues that counsel rendered deficient performance by giving him erroneous advice which resulted in his rejection of a "tentative" plea agreement for 15 years offered by the government. First of all, it is unclear that the government ever offered the plea agreement described by Simpson. In the government's response, it states that it "can neither confirm nor deny that such an offer was actually extended to petitioner." [Doc. 403 at 42]. Simpson, on the other hand, simply states in his affidavit that counsel informed him that "the government offered me a 15-year plea . . ." [Doc. 375, Ex. 2, ¶ 27]. The plea agreement, however, has not been produced by Simpson.

Petitioner claims that he would have accepted the deal offered but for his attorney's erroneous advice that his maximum sentencing exposure if convicted on all charges was 23-years, a difference of only eight years. He asserts that he would have accepted the offered deal if he had known that he was in reality facing "a mandatory minimum sentence of over 56-years if convicted

37

at trial." He asserts that he was never "told by [counsel] or anyone about the mandatory minimum sentence that the three § 924(c) charges carried."

This claim fails for two reasons. First, petitioner's claim that he was unaware of the possible mandatory minimum sentence or the possible maximum of life is patently incorrect. Simpson was advised by the Court of both the mandatory minimum sentence which applied and the maximum possible sentence at his arraignment on the indictment. His assertion that he thought he was facing a "maximum of 23-years if I was convicted at trial on everything" is, therefore, contradicted by the record.

Second, even if petitioner could show deficient performance on the part of counsel, he can show no prejudice. Since he had been advised by the Court of both the minimum and maximum sentences, he cannot credibly argue any prejudice from advice given by his attorney. More importantly, however is the Court's action in vacating petitioner's conviction as to Court 10 of the indictment. Given Simpson's assertion that he would have accepted the offered plea agreement had he known of the 25 year consecutive sentence which applied to Count 10, he clearly cannot show he would have accepted the plea agreement if Count 10 is taken out of the mix. The sentence he has received after the *Booker* remand and the vacation of his conviction in Count 10 is 181 months, only one month more than if he had accepted the allegedly offered 15 years. This claim is without merit.

**E. Issue VII–IAC For Failing to Object to the Introduction of Inadmissible Evidence**

On October 17, 2002, Simpson's counsel filed a motion in limine seeking exclusion of certain items seized during the December 9 search of Simpson's home, including marijuana and

38

drug paraphernalia. The motion *in limine* was ultimately denied on December 4, 2002, [Doc. 124]. The Court's order, however, did find, in ruling on a co-defendant's motion, that the marijuana and paraphernalia were irrelevant to the pending charges and excluded those items "unless a defendant open[ed] the door to them."

Petitioner now claims, in a somewhat incoherent argument, that testimony at trial about two sets of postal scales seen by Officer Hickman during the search and the introduction of a triple beam scale later seized somehow violated the Court's order. He argues that counsel was ineffective for failing to object to the admission of the evidence which he says "had been suppressed by the Court's order." [Doc. 375 at 49]. Simpson is mistaken. While the Court did find evidence of the marijuana and paraphernalia to be irrelevant, petitioner's motion *in limine* was otherwise denied. The whole premise underlying this claim is therefore erroneous and the claim lacks merit.

Apparently recognizing his failure, petitioner changes direction in his reply to the government's response and argues instead that the scales "should have been covered by the Court's order" and "counsel should have recognized this and objected" to the admission of the evidence. Counsel cannot be faulted for failing to object further at trial when the motion *in limine* had previously been denied. Counsel is not ineffective for failing to again raise an issue after the Court has already ruled against him.

Furthermore, although not explicitly stated in the Court's order, the scales were as relevant on the methamphetamine charges as they would have been on a marijuana charge, notwithstanding the fact that they were found in a bag with marijuana or near marijuana. As the government points out, the scales could have been used to weigh methamphetamine, marijuana, or both, and were thus clearly relevant to the methamphetamine counts. This belated claim by

39

petitioner also lacks merit and petitioner has not established deficient performance by counsel.

**F.    Issue VIII–IAC For Failure to Challenge Petitioner's Conviction For Kidnapping with Respect to the Interstate Commerce Element**

With this claim, Simpson in essence challenges the sufficiency of the evidence to sustain his conviction as to Count 9 for kidnapping in violation of 18 U.S.C. § 1201. More specifically, he claims that the "evidence failed to establish the interstate commerce nexus that is required for a conviction." [Doc. 375 at 50]. Petitioner apparently claims that counsel failed to raise this issue in the Sixth Circuit on appeal and that, if he had done so, "the Sixth Circuit would have . . . vacated the kidnapping count against petitioner," and "he would not have been sentenced to prison for Count Nine." Simpson's only factual assertions in support of his claim are that Howe stated that petitioner was in Tennessee initially, that White stated that petitioner exited the car in Tennessee, and that McDavid testified that he could not identify the assailants; otherwise, he does not further develop his argument.

Evidence is sufficient to sustain a conviction if "viewing the evidence in the light most favorable to the prosecution, any rational trier of facts could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In addition, circumstantial evidence alone "may sustain a conviction so long as the totality of the evidence was substantial enough to establish guilt beyond a reasonable doubt." *United States v. Phibbs*, 999 F.2d 1053, 1064 (6th Cir. 1993). Substantial evidence means "such relevant evidence as a reasonable mind might accept to support a conclusion." *United States v. Sherlin*, 67 F.3d 1208, 1214 (6th Cir. 1995), *cert. denied*, 516 U.S. 1082 (1996) (quoting *United States v. Martin*, 375 F.2d 956, 957 (6th Cir. 1967). "The credibility of witnesses is exclusively the province of the jury."

*United States v. Bond*, 22 F.3d 662, 667 (6th Cir. 1994).

Contrary to petitioner's assertion, the government did offer testimony from which the jury could, and did, find that petitioner was involved in transporting the victims in interstate commerce, *i.e.*, from Tennessee to Virginia. The government notes in its response that while White did testify that Simpson exited the car in Tennessee, both White and McDavid testified that petitioner then got into a red Cavalier and followed the car driven by Ajan in which the victims were riding while maintaining contact with Ajan by two-way radio. More importantly, when the car carrying the victims stopped at a Texaco gas station after crossing into Virginia, the red Cavalier, driven by petitioner, pulled in behind them and Ajan walked to the red Cavalier and spoke with Simpson. This evidence, believed by the jury, as was within its province, is sufficient to support the interstate commerce element of the kidnapping offense. Most importantly of all, however, the record establishes that counsel did raise the sufficiency of the evidence on appeal and the argument was specifically rejected by the Sixth Circuit which found that "the government presented ample evidence in support of each conviction . . . . A reasonable jury, in short, had sufficient bases to convict Simpson . . ." *Simpson*, 116 Fed. App'x at 743. This claim clearly lacks merit. Even if counsel had not raised the issue of sufficiency of the evidence, he could not be faulted for failing to raise an issue lacking merit. The record here, however, shows that counsel did exactly what petitioner claims he did not do. There was no deficient performance by counsel on this issue.

G.      **Issue IX–IAC For Failure to Challenge in the District Court and On Appeal That Petitioner's § 924(c) Conviction Under Count Seven Was Not During and in Relation to a Drug Trafficking Offense**

Count Seven of the indictment charged "use, by brandishing [of] a firearm during and in relation to a drug trafficking offense," *i.e.*, a conspiracy to distribute and possess with the intent

41

to distribute methamphetamine as charged in Counts One and Two, a violation of Title 18 U.S.C. § 924(c)(1). The offense charged in Count Seven was alleged to have occurred on or about December 8, 2000. Simpson essentially argues now that the evidence was insufficient to sustain a conviction on this count of the indictment. More specifically, he argues that the drug offense occurred on December 4 and that there was no evidence that he possessed a firearm on that date. He also argues that counsel was deficient "for failing to challenge in the district court that according to the law and the jury instructions given, that in order for petitioner to be convicted under Count Seven, he would have to first be convicted under Count One, the underlying predicate offense." [Doc. 375 at 51].

Petitioner's argument suffers from two flaws. First a challenge to the sufficiency of the evidence may not be raised in a § 2255 petition. The Sixth Circuit has repeatedly and consistently held that the "sufficiency of the evidence to support a conviction may not be collaterally reviewed on a Section 2255 proceeding." *United States v. Osborn*, 415 F.2d 1021, 1024 (6th Cir. 1969). Second, even though Simpson is correct that a conviction under 18 U.S.C. § 924(c)(1) required the government to prove that he committed an underlying predicate drug trafficking crime, he is incorrect that the government had to prove that he was guilty of Count 1. Count 2, however, also charges a drug trafficking crime which was a sufficient predicate offense. Thus, as the jury was correctly charged, conviction of either Count 1 or Count 2 was sufficient for the element requiring that Simpson committed the underlying drug trafficking crime. He was convicted of Count 2. Furthermore, Count 2 charged a conspiracy from approximately "November 2000, and continuing to on or about December 9, 2000." Clearly, December 8 is a date within the time frame of the conspiracy charged in Count 2.

42

### H.    Issue X–IAC of Appellate Counsel

Petitioner alleges that his counsel on direct appeal was deficient in several ways: (a) for failing to litigate on appeal that Count 10 failed to charge a federal offense; (b) for failing to litigate on appeal that the indictment in No. 2:03-CR-98 failed to charge a federal offense; (c) for failing on appeal to litigate petitioner's Fourth Amendment claims; and (d) for failing to litigate on appeal the assessment of one criminal history point in No. 2:03-CR-98.

Petitioner's conviction and sentence on Count 10 have now been vacated. The Court has determined that petitioner's challenge to the sufficiency of the evidence in No. 2:03-CR-98 and his Fourth Amendment claims lack merit and counsel is not deficient for failing to raise meritless issues. With respect to (d), petitioner correctly asserts that he received one criminal history point pursuant to USSG § 4A1.2(c)(1) for his October 18, 2001 conviction for possession of marijuana and drug paraphernalia and going armed for which he received a sentence of eleven months and twenty nine days, suspended to probation.

Simpson now claims that Amendment 709 to the Sentencing Guidelines should have been applied to his case and, if it had, the one criminal history point referenced above would not have been assessed. Amendment 709 to the Sentencing Guidelines took effect on November 1, 2007, and does not apply retroactively. *United States v. Horn*, 679 F.3d 397 (6th Cir. 2012). Judgment was entered in case No. 2:03-CR-98 on January 1, 2007, long before the effective date of Amendment 709. Amendment 709 thus had no application to petitioner's case at the time of sentencing.

On November 20, 2007, petitioner sent a letter to appellate counsel claiming that Amendment 709 should be applied to his case. Counsel correctly declined to raise the issue on

appeal. As noted above, Amendment 709 was not retroactive and petitioner was correctly sentenced under the guidelines in effect at the time of his sentencing. Even if Amendment 709 had been in effect, however, the criminal history point referenced above would still have been properly assessed. Pursuant to USSG § 4A1.2(c)(1) certain prior misdemeanor and petty offenses are not counted unless "the sentence was a term of probation of more than one year or a term of imprisonment of at least thirty days." USSG § 4A1.2(c)(1). That provision of the guidelines, however, applies only to certain enumerated offenses or offenses similar to those enumerated offenses. Neither possession of marijuana, possession of drug paraphernalia, nor going armed are listed and none of the enumerated minor misdemeanor and petty offenses are similar to those convictions. The criminal history point for Simpson's state misdemeanor offenses was properly assessed and this issue lacks merit.

I.    **Issue XI-- Prosecutorial Misconduct (False Testimony By Hickman)**

With this issue, Simpson claims that the prosecutor engaged in misconduct by the knowing use of perjured testimony by Officer Hickman that "petitioner gave consent and signed a consent form giving him permission to search petitioner's residence." [Doc. 375 at 59]. To support the claim, petitioner points to the affidavit of complaint filed by Hickman in state court which states that "Mr. Simpson's wife signed a consent to search form." He argues that, because the government had the affidavit in its possession, "they knew or should have known that Hickman's testimony was false and should have corrected his testimony to reflect that petitioner did not give permission to search his residence." [*Id*.].

Petitioner relies on *Kyles v. Whitley*, 514 U.S. 419 (1995) for the proposition that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the

44

judgment of the jury." This is a correct statement of the law. The argument of petitioner is flawed, however, because, as the government points out, Hickman did not testify at trial that petitioner consented to the search. Hickman testified only that the residence was searched on November 26, 2000, and that the search was based on a "consent-to-search form." Petitioner has not shown that this testimony was false nor has he shown that any false testimony by Hickman "affected the judgment of the jury."

      **J.**      **Issue XII–Cumulative Effect of Counsel's Alleged Errors**

Petitioner correctly argues that the cumulative effect of counsel's individual errors can amount to ineffective assistance of counsel, even though no individual act or omission was prejudicial. He then, in conclusory fashion, contends that there was cumulative prejudice established in the context of petitioner's issues. The Court has found, as set forth above, that counsel's performance was not deficient with respect to any of the issues raised as issues II through X. As the government argues, even if cumulative error could provide the basis for relief, no relief is warranted where "there are simply no errors to cumulate." *See Getsy v. Mitchell*, 495 F.3d 295, 317 (6th Cir. 2007).

**VI.**    **Conclusion**

For the reasons set forth herein, petitioner's § 2255 motion lacks merit as to all issues raised by the petitioner except for issue I challenging the validity of his conviction as to Count 10, upon which the Court has already granted relief. As to Issues II through XII, the petition is DENIED. The Court has already entered a judgment and order vacating Simpson's conviction in regard to Count 10 and amending his term of imprisonment accordingly. A judgment will now be entered denying the petition as to all other issues raised.

Under 28 U.S.C. section 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. 2253(c)(2). The Sixth Circuit disapproves of the issuance of blanket denials of certificates of appealability. *Murphy v.Ohio*, 263 F.3d 466(6th Cir. 2001). The district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id*. at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel, 529 U.S. 473 (2000)*. *Id*.

Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Having examined each of the petitioner's claims under the *Slack* standard, the Court finds that reasonable jurists could not find that this Court's dismissal of petitioner's claims was debatable or wrong. Therefore, the Court will deny petitioner a certificate of appealability.

A separate order will enter.

So ordered.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE
